UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Dayco Products, LLC,

    Plaintiff,

v.                                  Case No. 18-10862

Thistle Molded Group, LLC, d/b/a     Sean F. Cox
Moxness,                         United States District Court Judge

    Defendant.
_____/

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

A Tier-1 automotive supplier sued a Tier-2 automotive supplier, alleging that it violated a requirements contract by demanding a higher price and supplying defective parts. The Tier-1 supplier now moves for partial summary judgment on the issue of liability for the price increase. For the reasons below, the Court will grant the motion for partial summary judgment.

### BACKGROUND

Plaintiff Dayco Products, LLC, a Tier-1 automotive supplier, manufactures valved aspirator tube assemblies, which it then sells to Ford Motor Company for use in F-150 pickup trucks. Compl. ¶ 11. To make these assemblies, Dayco requires parts from Tier-2 automotive suppliers, including Defendant Thistle Molded Group LLC d/b/a Moxness. Moxness supplied Dayco with two parts: a check valve disc and a gate spring.

Around March 5, 2016, Dayco sent revised drawings of the parts to Moxness. Snyder Aff.

1

¶ 6 (ECF No. 15, PageID 89). Dayco designated these drawings as revision level F. *Id*. On March 8, 2016, Moxness returned an acknowledgment form for both parts, indicating that the "revision [was] accepted as is." *See* 28-0749-F Acknowledgment, Ex. 8 of Pl's Mot. Partial Summ. J. (ECF No. 15, PageID 126); 28-0752-F Acknowledgment, Ex. 9, (ECF No. 15, PageID 128).

On March 15, 2016, Dayco issued a purchase order to Moxness for the check valve discs and gate springs. PO 428079, Ex. 2 of Pl's Mot. Partial Summ. J., (ECF No. 15, PageID 93). The order was titled "requirements contract" and stated "[r]equirement [sic] contract issued for the purchased part referenced above. Dayco will furnish releases against this purchase order." *Id*. The quoted unit price for the check valve disc was $0.2187 and the quoted unit price for the gate spring was $0.3012. *Id*. The requested quantity for both was listed as "PER RLS." *Id*.

The purchase order outlined the terms of the offered requirements contract and expressly rejected any prior terms that the parties may have discussed:

> This Requirements Contract is limited to its terms stated herin [sic], and the Terms and Conditions of Purchase available at www.daycosupplier.com. Any additional or different terms proposed by Seller are rejected, and are not binding on Buyer unless expressly agreed to by Buyer in writing. Subject to Buyers [sic] termination rights, this contract is binding on the parties for the length of the applicable OEM vehicle program production life (including model refreshes as determined by the OEM).

(ECF No. 15, PageID 94).

As incorporated into the order, the Terms and Conditions on Dayco's website further elaborated on the contract. In Section B.1, the Terms reiterated that this purchase order was for Dayco's requirements and outlined how Dayco would communicate its needs to Moxness:

> If the quantify of Items to be purchased is not specified on the Order, then the quantity is for Purchaser's requirements and the Purchaser will, by a written or electronic authorization (a "release") communicate to the Seller, from time to time, the quantity of Items to be purchased and the due dates for delivery of such items.

2

(ECF No. 15, PageID 104)

In Section B.2, the Terms prohibited any price changes:

> The prices specified on the Order are fixed and shall include all charges and expenses related to the sale of the Items to Purchaser and no additional charges shall be added to the amount due from Purchaser in connection with the sale of the Items including, but not limited to, surcharges, shipping, packaging, taxes and duties.

*Id*.

The Terms provided four ways for Moxness to accept the requirements contract. Moxness could (1) fail to object to the provided terms within two business days of receipt of the order; (2) commence work on the parts; (3) ship the parts; or (4) sign and return the terms. (ECF No. 15, PageID 106).

The Terms also stated that they, along with the order, would constitute the entirety of the agreement between Dayco and Moxness. (ECF No. 15, PageID 115).

On March 31, 2016, Moxness delivered an invoice for 2,548 check valve discs to Dayco. Moxness Invoice SII/59317, Ex. 6 of Pl's Mot. (ECF No. 15, PageID 122). On April 4, 2016, Moxness delivered a second invoice for 103 gate springs. Moxness Invoice SII/59322, Ex. 7 of Pl.'s Mot. (ECF No. 15, PageID 124). Moxness delivered parts to Dayco under the purchase order in March, April, May, June, and July of 2016. Snyder Aff. ¶ 5. (ECF No. 15, PageID 89).

On April 21, 2016, Dayco issued a new part drawing for the gate spring. Ex. G of Def.'s Res. (ECF No. 22, PageID 265-266). Dayco designated these drawings as revision level G. *Id.* "But, Moxness never responded to that revision, and so the parties never implemented it." Snyder Aff. ¶ 7. (ECF No. 15, PageID 89).

On July 15, 2016, Moxness informed Dayco that it could no longer manufacture the check valve disc or gate spring at the agreed-upon price. Ex. C of Def.'s Res. (ECF No. 21, PageID 227).

Moxness stated that the gate spring had a higher-than-anticipated manufacturing cost because of the "substantial cycle time and the unexpected scrap rate of the part." *Id.* Similarly, the check valve disc was more expensive because of a "cycle time" increase. *Id.* In other words, the parts took longer than expected to make and wasted too much raw material. Moxness's new quote priced the check valve disc at $0.5728/unit (more than 2.5 times greater than the purchase order's price) and the gate spring at $3.7028/unit (more than 12 times greater than the purchase order's price). Ex. 11 of Pl's Mot. (ECF No 15, PageIDs 135 and 137).

On August 5, 2016, Dayco issued a new purchase order, which agreed to a higher price for the parts. Ex. 12 of Pl.'s Mot. (ECF No. 15, PageID 141). Dayco would purchase the check valve discs for $0.5728/unit and the gate springs for $1.3064/unit. This increase is more than 2.5 times the prior price of the discs and more than 4 times the prior price of the springs. Dayco paid these higher prices, under protest, to ensure that it could meet its obligations to Ford. *Id.* ("Modified pricing will be paid under protest as an effort to mitigate damages. Dayco reserves its rights to purse all claims that Dayco may have arising under or related to this modification.").

Eventually, Dayco stopped dealing with Moxness, and began purchasing discs and springs from a different Tier-2 supplier. This new supplier charged higher prices than those contracted-for in the first purchase order between Dayco and Moxness. Snyder Aff. ¶ 9.

On March 14, 2018, Dayco filed a two-count complaint. (ECF No. 1). The first count alleged that Moxness breached the contract by increasing the price. (ECF No. 1, PageID 8). The second count alleged that Moxness breached the contract by delivering defective parts throughout the life of the contract. (ECF No. 1, PageID 9).

On September 21, 2018, Dayco moved for partial summary judgment on the issue of

4

Moxness's liability for the price increase. Dayco argues that it had a valid, fixed-price requirements contract with Moxness, and that Moxness breached this contract by demanding a price increase. In response, Moxness argues that there was no valid requirements contracts, that its invoices constituted counter-offers, and that Dayco has failed to establish that Moxness actually breached the contract.

## ANALYSIS

Summary judgment will be granted where there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuine issue of material fact exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. The Court "must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the non-moving party." *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002).

The parties agree that Michigan law governs in this case. Accordingly, the Michigan Supreme Court is the controlling authority. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). If the Michigan Supreme Court has not decided an issue, then the Court "must ascertain the state law from all relevant data." *Orchard Grp., Inc., v. Konica Med. Corp.*, 135 F.3d 421, 427 (6th Cir. 1998) (citations omitted). "Relevant data includes state appellate court decision, supreme court dicta, restatements of law, law review commentaries, and majority rule among other states." *Id*.

5

**I.     The Existence of a Requirements Contract**

"The primary goal in the construction or interpretation of any contract is to honor the intent of the parties." *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 127 n.28, 517 N.W.2d 19 (1994). "The language of the parties' contract is the best way to determine what the parties intended." *Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459, 476, 663 N.W.2d 447 (2003). Dayco has the burden of proving that a contract exists, the terms of the contract, and that Moxness's action constituted a breach. *See Johnson Controls, Inc., v. TRW Vehicle Safety Systems, Inc.*, 491 F.Supp.2d 707, 720 (E.D. Mich. 2007).

Dayco argues that the parties entered into a requirements contract, which is a contract where " a buyer promises to buy, and a seller to supply, all the goods or services that a buyer needs during a specified period." Black's Law Dictionary (10th ed. 2014). Dayco contends that the first purchase order constituted an offer, which Moxness accepted by commencing work on and shipping the parts without objection. In response, Moxness argues that the purchase order did not create a contract—requirements or otherwise—between the parties because it lacked a specific quantity term and exclusivity.

Based on the plain language of the purchase order, and the Terms incorporated therein, Dayco has the better of this argument. The purchase order identified itself as a "requirements contract" three times. It also expressly incorporated Dayco's terms, which outlined how Moxness could accept the offer. One way was "commencement of work" on the parts. (ECF No. 15, PageID 106). Another way was to ship the parts. *Id*. Moxness did both. Thus, by its actions, Moxness accepted the offer of a requirements contract according to the offer's clear terms.

Moxness mounts two challenges to Dayco's characterization of the purchase order as a

requirements contract. First, it argues that the purchase order lacked a sufficient quantity term. Second, it argues that the contract fails for lack of exclusivity. Neither of these arguments has merit.

  **a.**   **Quantity Term**

Moxness argues that the contract is unenforceable because it does not have a quantity term. Requirements contracts, however, will often lack a specific quantity term because just-in-time buyers do not know how much product they need until they need it. Michigan's Uniform Commercial Code provides for this problem. In M.C.L.A. § 440.2306(1), the U.C.C. states that "[a] term which measures the quantity by...the requirements of the buyer means such actual...requirements as may occur in good faith, except no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior...requirements may be tendered or demanded." The comment to that section goes on to state that a requirements contract "is not too indefinite since it is held to mean the actual good faith output or requirements of the particular party." *Id.* at cmt. 2.

Here, the purchase order repeatedly identified itself as a requirements contract and stated that Dayco would communicate its periodic orders by release. This arrangement is a common in the automotive industry. *See, e.g,. JD Norman Industries v. Metaldyne, LLC*, 2016 WL 1637561 at *7 (E.D. Mich. 2016) (noting that the nature of "just in time" automotive supply chains is "well established" in this district) (internal citations omitted). Further, Dayco's Terms stated that "[i]f the quantity of Items to be purchased is not specified on the Order, then the quantity is for [Dayco's] requirements and [Dayco] will, by a written or electronic authorization (a "release"), communicate to [Moxness], from time to time, the quantity of items to be purchased and due dates for delivery of such items." (ECF No. 15, PageID 104). Because the plain language of the purchase order shows

7

that the parties entered into a requirements contract, the contracted-for quantity was Dayco's actual, good-faith requirements, except those that were unreasonably disproportionate. *See* M.C.L.A. § 440.2306(1). This quantity is sufficiently precise to enforce the contract. *See Lorenz Supply Company v. American Standard, Inc.,* 419 Mich. 610, 615 (1984) ("A requirements or output term of a contract, although general in language, nonetheless is, if stated in the writing, specific as to quantity, and in compliance with [the statute of frauds]"); *See also Johnson Controls, Inc.*, 491 F.Supp.2d at 714-717 (finding that a purchase order that listed the quantity as "AS REL" had a sufficiently precise quantity because it "gives some indication that [the plaintiff] intended to purchase and [the defendant] intended to sell some quantity of parts.").

Moxness attempts to sidestep this conclusion by arguing that this contract's quantity term was dictated by Dayco's releases, not its requirements. To support this argument, Moxness points to *Advanced Plastics Corp. v. White Consol. Indus., Inc.,* 47 F.3d 1167 (Table), 1995 WL 19379 (6th Cir. 1995). In that case, however, the parties redefined the contract's quantity term by stating "Seller agrees to furnish Buyer's requirements for the goods or services covered by this Purchase Order to the *extent of and in accordance with*...Buyer's written instructions." *Id*. at *2. (emphasis added). No such language appears in the contract between Dayco and Moxness.[1]

Thus, the Court concludes that this contract does not fail for lack of a sufficient quantity term.

---

[1]Moxness also argues that its relationship with Dayco "strongly resembles" the blanket purchase order in *Sundram Fasteners Ltd. v. Flexitech, Inc*., 2009 WL 3763772 (E.D. Mich. 2009). However, the findings of fact in *Sundram* are of no value here because, in that case, the parties stipulated that the purchase order was not a requirements contract.

**b.     Exclusivity**

Next, Moxness argues that the requirements contract is unenforceable because it does not require Dayco to purchase all of their check valve discs and gate springs from Moxness. This lack of exclusivity, Moxness argues, would be fatal to Dayco's claim in most jurisdictions. (ECF No. 21, PageID 235) (citing federal appellate, federal district, and state appellate court opinions applying the law of California, Georgia, Idaho, Illinois, Indiana, Kansas, Maine, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, North Dakota, Ohio, Oregon, and the United States Court of Federal Claims). However, both parties agree that the Michigan Supreme Court has not addressed whether exclusivity is required for a requirements contract to be valid under Michigan law.

As evidenced by Moxness's cited cases, the view that requirements contracts must be exclusive appears to be well-established in most jurisdictions. *See also* 1 White, Summers, and Hillman, Uniform Commercial Code § 420 (6th ed.) ("a 'requirements contract,' in order to be valid, must (1) obligate the buyer to buy goods, (2) obligate the buy to buy the goods *exclusively* from the seller, and (3) obligate the buyer to buy all goods of a particular kind form the seller.") (emphasis added). However, the Michigan Court of Appeals and courts in this district have found that requirements contracts do not need to be exclusive. *See General Motors Corp. v. Paramount Metal Products, Co.*, 90 F.Supp.2d 861, 873) (E.D. Mich. 2000); *Plastech Engineered Products v. Grand Haven Plastics, Inc.*, No. 252532, 2005 WL 736519 at *7 (Mich. Ct. App. 2005) (unpublished per curiam) (relying on *General Motors Corp.*, 90 F.Supp.2d at 873). To determine whether non-exclusive requirements contracts are permissible in Michigan, this Court would need to predict whether the Michigan Supreme Court would agree with the majority out-of-state view or with what appears to be a minority view expressed by some courts in Michigan

However, for the purposes of this motion, the Court need not answer this question because the contract between Dayco and Moxness was exclusive. Dayco's terms stated that "the quantity is for [Dayco's] requirements." As explained above, this term means that Dayco committed to purchase all of its actual, good-faith requirements from Moxness. If Dayco required a check valve disc or a gate spring, it was contractually obligated to purchase it from Moxness. Thus, Moxness's argument that the contract fails for lack of exclusivity is meritless because it contradicts the clear terms of the contract.

## II. Moxness's Invoices

Moxness argues that its invoices constituted counter-offers, and that any contract between the parties incorporated its own terms and conditions. Under Moxness's terms, it has the power to increase prices if its costs increase, as determined by Moxness in good faith. Moxness's Terms and Conditions of Sale, Ex. 14 to Pl. Mot. (ECF No. 15, PageID 144). In Moxness's view, it received Dayco's purchase order, and counter-offered to sell a specific quantity of parts on a specific date by shipping the parts and issuing the invoice.

Once again, however, this argument contradicts the purchase order's clear terms, which stated that Moxness could accept the offer of a requirements contract by commencing work or shipping the parts. Thus, by the time that Dayco received Moxness's invoice, Moxness had already accepted the requirements contract.

Moxness's argument also implicates a provision of Michigan's Uniform Commercial Code that is known as the "battle of the forms." Under M.C.L.A § 440.2207(1) "[a] definite and seasonable expression of acceptance or a written confirmation...operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance

is expressly made conditional on assent to the additional or different terms." M.C.L.A § 440.2207(2) continues, "[t]he additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless: (a) the offer expressly limits acceptance to the terms of the offer; (b) they materially alter it; or (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received."

Here, Moxness's invoices and shipments—in response to Dayco's purchase order—constituted a definite and seasonable expression of acceptance. Moxness's invoices included different and additional terms, most notably the ability of Moxness to unilaterally raise prices in good faith. These terms were not incorporated into the contract, however, because all three statutory exceptions apply. First, Dayco's purchase order was "limited to acceptance of the express terms contained on the Order and [the] Global Terms." (ECF No. 15, PageID 106). Second, Moxness attempted to change the contract from a fixed-price requirements contract to a fixed-quantity contract with a potentially fluid price. These changes are undoubtedly material. Third, Dayco had preemptively objected to any additional or different terms. *Id*. Thus, Moxness clearly accepted Dayco's offer of a requirements contract without incorporating any of its own terms.

### III. Moxness's Breach

Finally, Moxness argues that Dayco has failed to demonstrate that Moxness breached the parties' contract because Moxness's contractual obligations only triggered upon Dayco issuing a release, which Dayco never did after Moxness communicated its unwillingness to deliver at the contract price. However, the U.C.C. states that, "[w]here the seller...repudiates...then with respect to any goods involved...the buyer may cancel and...(a) 'cover' and have damages...as to all the goods affected..." M.C.L.A. § 440.2711(1). Repudiation "centers upon an overt communication of

intention...which...demonstrates a clear determination not to continue." M.C.LA § 440.2610 cmt. 1.

Here, Moxness clearly repudiated by informing Dayco that they were unwilling to deliver at the contract price. Under those circumstances Dayco is not obligated to jeopardize its production schedule by issuing a release that Moxness already stated it would not fill. Instead, Dayco may pay under protest or find replacement parts and then sue for any money it paid above the contract price—which is exactly what it did here. Thus, the Court concludes that Moxness breached the contract by unequivocally stating that it was unwilling to deliver at the contract price.

## CONCLUSION AND ORDER

For the reasons above, the Court GRANTS Dayco's motion for partial summary judgment as to the issue of liability on its price-increase claim.

IT IS SO ORDERED.

Dated: February 4, 2019             s/ Sean F. Cox
                                             Sean F. Cox
                                             U. S. District Judge